Filed 7/13/26  P. v. Harris CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MARVIN HARRIS,<br><br>        Defendant and Appellant. | A173496<br><br>(Contra Costa County<br> Super. Ct. No. 05000254904) |

Marvin Harris appeals from an order compelling involuntary treatment with antipsychotic drugs.  His appointed appellate counsel filed a brief setting forth the applicable facts and law pursuant to *Conservatorship of Ben C.* (2007) 40 Cal.4th 529 (*Ben C.*).  Appointed counsel informed Harris that he could file a supplemental brief, but Harris has not done so.  Our discretionary review of the record discloses no arguable issues, and we therefore affirm.

## BACKGROUND

Harris is an inmate housed at the Martinez Detention Facility.  In January 2025,[1] the Contra Costa County Department of Health Services (Department) filed an ex parte petition pursuant to Penal Code section 2603,

_____

[1]  Further references to dates will be to the year 2025 unless otherwise specified.

1

subdivision (d) for an order authorizing involuntary interim administration of psychotropic medication to Harris.

The trial court granted the petition on January 17, appointed counsel for Harris and authorized administration of medication pending an expedited hearing.

The declaration of psychiatrist, Dr. Brian Holoyda, stated that he had diagnosed Harris with schizophrenia and described the symptoms supporting this diagnosis. Harris had become progressively more psychotic, agitated and violent toward others since declining treatment with antipsychotic medication in May 2024. Holoyda related staff reports that in December 2024, Harris threw Kool-Aid at a deputy, threatened to throw feces, hit or kill deputies and was found to have feces on the desk in his cell. In another incident that month, Harris assaulted a peer without provocation and was described by a mental health clinician as "rambling, hyperverbal and grandiose," "delusional, verbally aggressive and disorganized." Dr. Holoyda explained his determination that Harris lacked capacity to provide informed consent or refusal of treatment with psychiatric medication, described unsuccessful efforts to obtain informed consent, discussed the expected benefits and possible side effects of medication, absence of alternative treatments and risks of further deterioration and danger to self and others.

On February 10, the court allowed the interim order to lapse after being informed that Harris was taking medication voluntarily.

On April 7, the Department filed and the court granted a new petition for involuntary interim treatment. The declaration of psychiatrist Zachary Tiger explained that Harris had improved significantly while voluntarily taking his medication, then refused treatment and

decompensated.  Incidents reported by mental health clinicians included Harris was "yelling and screaming" from his cell, threatening to beat up other inmates, being unable to engage in reasonable conversation, displaying increased agitation, threatening to kill a deputy and making a weapon from books wrapped in medical tape in order to do so and "gassing" deputies.  His medication compliance had "slowly declined" and "most recently he ha[d] declined 4 of the last 6 days."

An evidentiary hearing was held on April 21, at which the Department presented testimony from Deputy Sheriff Simone Sheppard and Dr. Matthew Paley.  Sheppard testified that on February 15 she heard Harris and another inmate "swearing at each other and making threats" to beat each other up. Harris continued to "scream and swear" despite directions to stop. On March 28, Sheppard was told to remove all personal items from Harris's cell due to him "throwing bodily fluids on a deputy."  Searching the cell while Harris was out, Sheppard found a clear plastic bag, tied at the top and full of a "clear, foul-smelling liquid."  Earlier, Harris had been "incessantly" shouting sexually abusive comments at Sheppard and another deputy, and when he returned to his cell, he was very upset about not having his belongings and "continued to do what he was doing at the beginning of the shift, which was just shouting explicit remarks towards me and my partner, saying that he wanted to rape us, kill us, have sex with us . . . . "

On March 30, Harris was again "screaming abusive remarks" at Sheppard and when a mental health clinician tried to make contact with him, he "spoke over her," screamed at her, "told her to go get his property and called her a ho."  He repeatedly said he was going to find Sheppard and kill her "when I get out in 30 days."  Sheppard acknowledged that Harris was in a locked cell and did not have a potential release date.

3

Dr. Paley testified as an expert in psychiatry. He had known Harris about six months and had had six to eight clinical visits with him, including on the morning of the hearing. He observed psychiatric symptoms including a disorganized pattern of thought and lack of insight. The former was reflected in rambling speech that did not make sense, with references to people wanting to harm him. Harris showed a lack of insight in that he said he did not believe he has mental illness or needs to take medication. In visits over the preceding two months, Paley had observed agitation and paranoia, and Harris "endorsed thoughts that he wants to harm other people."

Dr. Paley diagnosed Harris with schizophrenia, with symptoms of disorganized thought and behavior and "[d]elusions of paranoia." In reaching his diagnosis, Paley had reviewed Harris's medical records, considered his clinical visits and discussed Harris's symptoms with the other psychiatrists, deputies who worked on Harris's module, and a mental health counselor. Paley opined that Harris required treatment with antipsychotic medication, it was probable there would be serious harm to his physical or mental health if he was not treated, and he did not have the capacity to consent or refuse treatment because he did not believe he has a mental illness. Paley testified that schizophrenia can become harder to treat over time and the paranoid thoughts associated with the illness could result in Harris "continuing to exhibit aggressive, erratic behavior and that could put him into environments . . . that are high risk of violence towards himself or someone else . . . ." Without treatment, Harris would pose a risk of physical harm to himself or others "by way of a fight or something like that."

Dr. Paley testified that Harris's prescribed medication can help with disorganized thought, paranoia and mood. Since the involuntary medication proceeding was dropped in February, Harris had generally taken his

4

medication but there were "some missed doses."  Paley had prescribed emergency medication for Harris at least twice in the month before the hearing.  Regarding those situations, Harris told Paley one of the deputies had "called him the 'N' word" and had stolen his food, and said he had thrown liquid on a deputy.

Dr. Paley testified that antipsychotic medication is the main form of treatment for schizophrenia, the only viable option for treating Harris and the least intrusive way to make him not dangerous to himself or others.

At the conclusion of the testimony, the trial court noted that it was "an interesting question" whether there should be an involuntary medication order for someone who "is generally agreeing to medications" but the issue before the court was "danger to self or others."  (See Pen. Code, § 2603, subd. (c)(2).)  The court concluded based on Dr. Paley's testimony that Harris had a serious mental illness as required by the governing statute.  (*Id.*, subd. (c)(1).)  The court acknowledged that Harris was in custody, behind locked doors, when he was making threats but stated, "he is making them repeatedly and has thrown unidentified liquids at . . . a Deputy. . . . [¶] Given the nature of the liquids that have been found in his cell and the extensive threats he's made towards female deputies, I do find sufficient, clear, and convincing evidence of a danger to self or others."  The court granted the petition and issued an order authorizing involuntary treatment with psychiatric medication.  Harris filed a timely notice of appeal.

## DISCUSSION

"In an indigent criminal defendant's first appeal as a matter of right, the Court of Appeal must independently review the record if appointed counsel represents he or she has found no arguable issues.  (*Anders v. California* (1967) 386 U.S. 738 (*Anders*); *People v. Wende* (1979) 25 Cal.3d 436

5

(*Wende*).)" (*Ben C., supra,* 40 Cal.4th at p. 535.) *Ben C.* declined to extend *Anders* and *Wende* to appeals from imposition of a civil conservatorship. (*Ben C.,* at p. 535.) *Ben C.* held, "If appointed counsel in a conservatorship appeal finds no arguable issues, counsel . . . should (1) inform the court he or she has found no arguable issues to be pursued on appeal; and (2) file a brief setting out the applicable facts and the law." (*Id.* at p. 544.) In addition, the "conservatee is to be provided a copy of the brief and informed of the right to file a supplemental brief." (*Id.* at p. 544, fn. 6.) The reviewing court may then dismiss the appeal if there are no arguable issues. (*Id.* at p. 544.) Alternatively, the court has discretion to conduct an independent review. (*Id.* at p. 544, fn. 7 [appellate court may choose to retain an appeal rather than dismiss it]; accord, *People v. Blanchard* (2019) 43 Cal.App.5th 1020, 1026.) While *Ben C.* addressed civil conservatorship proceedings, like procedures have been applied in criminal contexts where *Wende* review is not required. (E.g., *People v. Delgadillo* (2022) 14 Cal.5th 216 [postconviction relief under remedial legislation]; *Blanchard,* at pp. 1022, 1025 [competency to stand trial].)

Harris's counsel followed *Ben C.* procedures. Counsel reviewed the record and corresponded with Harris about her findings and his views of the case. By letter, counsel advised Harris of the nature of her brief; informed him that he could file a supplemental brief within 30 days of the filing of counsel's brief and that if requested counsel would send him a copy of the record on appeal, and that counsel would remain available to brief issues as requested by this court.

Although we are not required to conduct an independent review of the record, we have done so. The requirements of Penal Code section 2603 were

satisfied, Harris was represented by able counsel, and the court's findings were supported by substantial evidence.

## DISPOSITION

The order authorizing involuntary administration of antipsychotic medication is affirmed.

                    STEWART, P. J.


We concur.


MILLER, J.


DESAUTELS, J.


*People v. Harris* (A173496)